**UNITED STATES of America,**
**Appellant,**

v.

**Edmund M. AUTUORI, Defendant–**
**Appellee.**

**No. 1603, Docket 98–1547.**

United States Court of Appeals,
Second Circuit.

Argued June 24, 1999

Decided May 12, 2000

Nora R. Dannehy, Assistant United States Attorney, Hartford, CT (Stephen C. Robinson, United States Attorney for the District of Connecticut, Peter A. Clark, Assistant United States Attorney, on the brief), for Appellant.

William M. Bloss, Jacobs, Grudberg, Belt & Don, P.C., New Haven, CT (Ira B. Grudberg, Jacobs, Grudberg, Belt & Don, P.C., New Haven, CT, Robert M. Romano, Morgan, Lewis & Bockius LLP, New York, NY, Peter Buscemi, Morgan, Lewis & Bockius LLP, Washington, DC, on the brief), for Defendant–Appellee.

Before: MINER, JACOBS, and PARKER, Circuit Judges.

JACOBS, Circuit Judge:

This case is one of several fraud prosecutions arising out of the failure of Colonial Realty Company ("Colonial"), a Connecticut real estate development and syndication company. Defendant Edmund M. Autuori, an accountant with Arthur Andersen & Co. ("Andersen"), helped market one of Colonial's ventures. The indictment alleged that from December 1989 to September 1990, Autuori participated in a scheme to defraud by making materially misleading representations to potential investors.

After an eighteen-day trial in the United States District Court for the District of Connecticut (Burns, J.), a jury convicted Autuori on ten counts of mail fraud in violation of 18 U.S.C. § 1341 and six counts of wire fraud in violation of 18 U.S.C. § 1343. The judge, however, granted Autuori's motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29(c), and granted conditionally his motion for a new trial pursuant to Fed.R.Crim.P. 29(d).[1] *See United States v. Autuori,* No. 3:96–CR–161, 1998 WL 774232, at *32 (D.Conn. Aug. 28, 1998). The government appeals.

After a thorough review of the record, we affirm the judgment of acquittal as to some counts; as to the remaining counts, we conclude that there was evidence sufficient for a rational juror to find Autuori guilty beyond a reasonable doubt, but that the district court did not abuse its discretion in granting a new trial, for which purpose we remand.

## BACKGROUND

■ Our review of the district court's ruling on sufficiency of the evidence requires us to view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor. *See United States v. Guadagna,* 183 F.3d 122, 125 (2d Cir.1999). Because Autuori first moved for judgment of acquittal at the close of the prosecution's case-in-chief, the district court evaluated sufficiency on the basis only of the evidence presented by the government. *See Autuori,* 1998 WL 774232, at *15 n. 5 (citing Fed.R.Crim.P. 29(b)). We do likewise on appeal. *See* 2 Charles Alan Wright, *Federal Practice and Procedure* § 462 n. 10.2 (2d ed. Supp. 1999). In the fact exposition that follows, we first set out the essential background

---

1. The district court's grant of the motion for a new trial was conditioned on reversal on appeal of the grant of the motion for judgment of acquittal.

chronology, and then set out the facts concerning the conduct charged in the indictment.

## A. Chronology of Events

### 1. *Constitution Plaza*

Before it was forced into bankruptcy, Colonial was a large real estate development and syndication company. Its three principals were Jonathan Googel, Benjamin Sisti and Frank Shuch; the course of proceedings against those individuals is set forth in the margin.[2] Colonial acted as general partner in numerous limited partnerships formed to own and operate commercial real estate properties, mostly in Connecticut.

On behalf of one such partnership, Colonial purchased in 1988 the multi-building development in downtown Hartford known as Constitution Plaza. Colonial syndicated the development and marketed the participations under the name Colonial Constitution Limited Partnership (the "Partnership"). Colonial planned to raise $60 million by marketing Partnership shares, and to raise $22 million by marketing zero coupon bonds ("Constitution Zeros"), issued by the Partnership and secured by subordinated mortgages on its property. Other anticipated sources of financing included an $87 million permanent first mortgage, and short-term borrowing from a group of banks.

Autuori was a manager in the Andersen tax department. He started working with Colonial in 1984, and was Andersen's main "relationship guy" with the company. Beginning in September 1989, Autuori worked with Colonial on the Partnership project.

### 2. *The Private Placement Memorandum*

Colonial began selling Partnership shares in September 1989. All potential investors were given a copy of a Private Placement Memorandum ("PPM") prepared by Colonial and its counsel at Tarlow, Levy, Harding & Droney ("Tarlow Levy"). The PPM forecast the project's income and expenses over a ten year period beginning November 1, 1989, and identified such risk factors as fluctuations in the real estate market. The PPM used forecasts based on assumptions made by Colonial, and advised that the Partnership's success was wholly dependent on meeting these projections.

A letter signed by Andersen auditor Jack Krichavsky opined that there was a reasonable basis for the assumptions underlying the projected figures in the PPM. One of those assumptions was that Colonial would be able to pursue the same cost-effective management strategies employed in several of its previous projects—chiefly, raising parking revenues while lowering cleaning costs.

### 3. *The Eight–Month Audit*

Krichavsky also audited Constitution Plaza's *actual* revenues and expenses for the first eight months of 1989—immediately before the period covered by the PPM predictions ("the eight-month audit"). The eight-month audit projected that the Partnership's net operating income would fall

---

**2.** Googel pled guilty in June 1993 to two counts of wire fraud, one count of bank fraud, and one count of endeavoring to impede the due administration of the internal revenue laws. *See United States v. Sisti*, 91 F.3d 305, 308 (2d Cir.1996). He cooperated with the government and testified in several of the Colonial-related prosecutions. Googel was eventually sentenced to 87 months imprisonment. He has continued to cooperate with the government by testifying against Autuori with the understanding that the government would file a motion on Googel's behalf pursuant to Fed.R.Crim.P. 35(b) to reduce his sentence. That motion is currently pending.

Sisti pled guilty to two counts of bankruptcy fraud, one count of wire fraud, and one count of structuring transactions to evade reporting requirements, and was sentenced to a nine year term of imprisonment. *See Sisti*, 91 F.3d at 308. Sisti later pled guilty to additional bankruptcy fraud offenses. *See United States v. Sisti*, No. 97–CR–165 (D.Conn. Dec. 22, 1997). Shuch committed suicide while awaiting trial.

$3 million short of the $10 million predicted in the PPM for the year 1989. Krichavsky told Autuori and Shuch about the results of the audit.

### 4. The Sales of the Partnership Shares

One of the assumptions driving the PPM projections was Colonial's belief that the Partnership shares would be fully sold by November 1, 1989. But the Connecticut real estate market became sluggish, Partnership sales slowed, and shares were left unsold on the projected sell-out date. Colonial still had unsold shares on its hands when it entered bankruptcy on September 14, 1990. The slow sales impaired Colonial's ability to meet the PPM projections because (i) interest expense rose, (ii) interest income declined, and (iii) cash flow eroded.

### 5. The Change of Auditors

In January 1990, Colonial dropped Andersen as auditor and hired Joseph Cohan & Co. ("Cohan"). According to Googel, Autuori suggested the change because the audit results were making it hard for Andersen to assist with sales efforts that employed the projections. Googel testified that Autuori told him to hire new auditors because "the numbers weren't matching up well and [Autuori] didn't want to have to make representations on the projections for the offering memorandum based on the knowledge that he had that the numbers weren't coming in the way they should."

### 6. The February 1990 Sales Trip to Florida

On February 13, 1990, as marketing of the Constitution Zeros was beginning, Autuori, Googel, Sisti and Shuch traveled to Florida to market the Zeros to the National Laborers' Union. Googel testified that on the plane to Florida he admitted to Autuori that Colonial was paying a bribe (or "finder's fee") to Dominic Lopreato of the Connecticut Laborer's Union, for Zeros bought by his union.[3] At the conference, Googel made an enthusiastic sales pitch, seconded by Autuori. Autuori characterized the Zeros as a sound investment, said that he had reviewed the forecasts, and assured the audience that Andersen stood behind them.

### 7. The Management Company Budget

On March 1, 1990, Krichavsky received a copy of a Constitution Plaza budget prepared by its management company, Constitution Management Company (the "Management Company budget"), and later showed it to Autuori. The Management Company budget reflected that the 1990 net operating income for the project would be $3 million below the PPM projection; in effect, there had been no improvement in the conditions cited in Krichavsky's eight-month audit the prior October. Colonial was unable to lower costs and raise revenue, measures that were critical to the success of the Partnership project. Krichavsky's alarm was heightened by a concurrent "dramatic downturn" in the banking and real estate industries in New England.

Krichavsky and Autuori debated what to do. Autuori wanted to say nothing, and rely on the wording in Andersen's opinion letter that disclaimed any responsibility to update the opinion. They decided to bring their concerns to Colonial's lawyers at Tarlow Levy.

Autuori continued to meet with investors in aid of Colonial's sales efforts throughout March, following his receipt of the Management Company budget. These meetings form the basis for eight of the counts charged in the indictment (Counts 1–2 and 11–16). These meetings and Autuori's role in them are discussed in detail below.

Before Krichavsky and Autuori met with the lawyers, the new auditor (Cohan)

---

**3.** Lopreato was convicted of accepting a bribe in connection with his union's purchase of zero coupons in two other Colonial investments. See United States v. Lopreato, 83 F.3d 571, 574 (2d Cir.1996).

wrote to Tarlow Levy attorney Dane Kostin, reporting its audit findings and concluding that there were misrepresentations in the PPM. A meeting was held on March 29, 1990, attended by Autuori, Krichavsky, Dan Tracy of Andersen, and several Tarlow Levy lawyers. Kostin reported Cohan's findings, and Krichavsky discussed his concerns about the Management Company budget and the Partnership's apparent inability to meet its projected net income and cash flow. The meeting ended without a decision about whether the variances had to be disclosed to investors.

### 8. The April 20, 1990 Meeting

On April 20, 1990, Autuori, Krichavsky and Tracy met again with the Tarlow Levy lawyers to discuss the developments in the Partnership. As Kostin testified, the group discussed the unexpectedly high expenses for cleaning and interest on a promissory note, the unexpected shortfall from rentals and sales of the Constitution Zeros, and the downturn in the local real estate and banking economies. The lawyers asked the accountants if this information was material (i.e., whether an investor would want it), and the Andersen representatives confirmed that it was. Tarlow Levy then decided that disclosures had to be made to potential investors as well as to investors with money in escrow who were about to close on an investment in the Partnership. (This meeting is referenced hereinafter as the "April 20 meeting.")

Later that day, Autuori, Krichavsky, Tracy and the lawyers went to Colonial's offices to tell the principals about the need for disclosures. By all accounts, Googel became agitated. Googel testified that until this April 20 meeting, he thought that the Constitution Plaza was "doing fine" and "making money," and he feared that bad news would hamper the marketing of the Partnership shares and the Constitution Zeros. It was agreed at the meeting

that Colonial would send a letter offering rescission to those who had decided to invest, and that the PPM would be amended for future investors.

After the meeting, according to Googel, he met with Autuori and others in a "side meeting" at which they agreed to draft a "mild" disclosure that would not seriously compromise Colonial's ability to continue marketing the Partnership shares and the Constitution Zeros.

The next day, Krichavsky and Autuori reviewed the rescission letter drafted by Tarlow Levy. It disclosed the economic downturn in Connecticut, the slow sale of the Partnership shares and its impact on the Partnership's financing, the unexpectedly low parking and interest revenue, the unexpectedly high operating and interest expenses, and other material developments. The amendment to the PPM included the same text.[4]

Kostin gave the rescission letter to Shuch, who had undertaken to mail it to the investors. But the disclosures were never mailed. Googel claims that Shuch's assistant, Penny Kaiser, threw them out at Shuch's direction. Kaiser said that she prepared the envelopes for the mailing, and did nothing further with them. This conflicting testimony notwithstanding, it is undisputed that the required disclosures were never made.

### 9. Colonial's Deepening Problems

The government also adduced evidence concerning Colonial's financial decline and the degree to which Autuori was aware of it while he helped market the Partnership project. In January 1990, Googel told Autuori that Connecticut Bank & Trust Co. ("CBT") had recently demanded repayment of $7.5 million of Colonial's unsecured and undersecured debt. In February 1990, Colonial hired Richard Ermler, a real estate developer, to fix its financial

---

4. The disclosure to potential investors was originally drafted as an amendment to the PPM, but was later turned into a supplemental letter. The rescission letter, the original PPM amendment and the supplemental letter were identical in substance.

problems, but the deterioration continued. Ermler testified that Autuori attended several discussions with Colonial about the CBT lines of credit and Colonial's worsening finances.

In April 1990, Colonial began consulting with bankruptcy lawyers at Stroock & Stroock & Lavan. Autuori did not attend these meetings, but Googel testified that he told Autuori about them. Throughout spring and summer 1990, Autuori met with Googel and others to discuss (in Googel's words) the "deep financial trouble" and "survival" of Colonial. For example, Autuori was present at the discussion on April 19, 1990 of a plan to allow Colonial investors to reinvest their dividends in other Colonial projects. Ermler characterized the plan as a financial opportunity for Colonial as well as a solution to some of its financial problems.

Autuori also attended a meeting in the summer of 1990 at which Colonial decided to suspend dividends to most of its investors, but to continue the Partnership dividends to avoid raising a "red flag" that might scare away potential investors. To prepare its employees for questions from investors about the dividend suspension, an accountant at Deloitte & Touche created a Q & A script. The Q & A reassured investors that Colonial was not in financial trouble, in part because the company had "just *completed* our largest offering to date, raising almost $60,000,000 on the Constitution Plaza properties." Neither the Partnership shares nor the Constitution Zeros were ever fully sold. Googel testified that Autuori revised the accountant's draft of the document to make it more optimistic; the revised draft also failed to correct this misrepresentation.

From August to October 1990, Autuori acted as Colonial's financial chief of staff.[5] Colonial was forced into bankruptcy on September 14, 1990.

**B. The Charged Conduct**

The indictment charged Autuori with sixteen counts of fraud. As set forth in relevant detail below, Counts 14–16 concern Autuori's March 5, 1990 meeting with Richard Talley. Counts 2 and 11–13 concern his March 12, 1990 meeting with William Morgan. Count 1 concerns his representations to the Albany Local 190 Laborers' Union ("Albany Union"). Counts 3 and 5–10 concern a May 5, 1990 meeting with Gregory Gates. Finally, Count 4 charges fraudulent conduct in connection with Autuori's efforts to help Colonial raise more financing.

1. *Counts 14–16: Richard Talley*

On March 5, 1990, a few days after Autuori learned about the Management Company budget, he met with a California broker named Richard Talley to discuss the Partnership. Talley testified that Autuori assured him that the PPM forecasts were "good" and "credible" and emphasized the "validity and the correctness of the projections." Relying in part on Autuori's approval (and thus Andersen's as well), Talley recommended the Partnership to his investors and they eventually bought $2.4 million in Partnership shares.

2. *Counts 2 and 11–13: William Morgan*

A week later, on March 12, 1990, Colonial made a sales presentation to a number of brokers, including William Morgan of North Carolina. Before arriving, Morgan received by mail a program listing Autuori as a speaker. Morgan testified that an Andersen representative addressed the meeting, and vaguely described the representative (as middle-age, with dark hair and medium build). Morgan could not remember the speaker's name, nor could he identify Autuori. According to Morgan, the speaker discussed the PPM forecasts, but expressed no concerns about their validity. Based in part on Andersen's impri-

---

**5.** Autuori was not the CFO but was fulfilling part of a CFO's responsibilities in order to help Colonial. Autuori characterized this as being the "financial chief of staff."

matur, Morgan made a $75,000 investment in the Partnership on behalf of his clients.

Leo Kent, the Colonial salesman who organized the meeting, testified that Autuori was present and made a presentation, but conceded that he did not witness the presentation because he left when it began. The meeting was scheduled in Autuori's diary, and no changes to the itinerary were announced.

### 3. Count 1: Albany Union

The next day, Autuori, Googel, Sisti and Dominic Lopreato went to Albany to market Constitution Zeros to the Albany Union's Pension Fund. Autuori gave a "very positive presentation" and described the Constitution Zeros as a "safe" investment, without disclosing the projection problems or Colonial's financial difficulties. The pension fund invested $3 million in Constitution Zeros, citing Andersen's approval of the project as one of its reasons for doing so.

### 4. Counts 3 and 5–10: Gregory Gates

On May 5, 1990 (two weeks after the April 20 meeting at Tarlow Levy at which consensus was reached that the existing disclosures contained material misrepresentations), Autuori met with Gregory Gates, a broker from California who was conducting due diligence on the Partnership, to answer Gates's questions about the PPM. Without mentioning the disclosure that was supposedly sent out to potential investors, Autuori assured Gates that the numbers were "healthy" and that the local real estate market had "not changed in the last couple of years" and was in fact a "growth area." Autuori represented that the actual parking revenues and expenses were "very close" to the forecasts. Based in part on Autuori's representations, Gates recommended the Partnership to his clients, eight of whom invested a total of $1.6 million.

Gates testified that Autuori showed him a spreadsheet comparing the projected and actual numbers. Gates thinks he dis-

cussed the document with the prosecution (and later supplied a copy), but the government stipulated that it had no knowledge of such a spreadsheet. Despite confusion on the particulars, Gates did not retreat from his testimony concerning Autuori's representations about the health of the Partnership.

### 5. Related Allegations: Other Meetings with Investors

In addition to Talley, Morgan, Albany Union and Gates, Autuori marketed the Partnership shares to other potential investors. Although not the subject of any of the counts in the indictment, the government presented evidence concerning these meetings as circumstantial evidence of Autuori's participation in the scheme to defraud. In May or June 1990, a potential investor from California, Dr. Stephen Feinberg, asked Autuori to confirm the information set forth in a Colonial promotional brochure and in a letter from Googel promising to return any investment if, after three years, the investor wanted out. Autuori said that the guarantee could be honored, and represented that there had been no changes in the advertised investments since the printing of the brochure, which described Hartford as "one of the most dynamic markets in the country today."

On May 31, 1990, Autuori traveled to New York with a Colonial salesman, Douglas Mulcahy, to market the Partnership to the YMCA Pension Fund. Mulcahy could not recall the specifics of Autuori's participation, but recalled that they gave a positive presentation and made no mention of Colonial's failure to meet the PPM projections. Finally, on July 18, 1990, Autuori spoke to the Plumbers and Pipefitters Union, describing the Constitution Zeros as a sound and appropriate investment for the union. Autuori gave no warning of the problems with the Partnership project or of the financial problems that would force

Colonial into bankruptcy within two months.

### 6. *Count 4: Meetings on Colonial's Financing*

In April 1990, Autuori assured David Zaiken, an Andersen partner from San Francisco with ties to sources of capital in Japan, that Colonial was a reputable business. The next month, Autuori met Zaiken in San Francisco and was introduced to representatives of the Intercontinental Development Group ("IDG"), a Japanese investment firm. In July 1990, Zaiken returned to Connecticut with IDG representatives to continue their discussions. Stephen Wade, an IDG manager, recalled that Googel depicted Colonial as a prosperous organization. Autuori was present, but did not mention Colonial's financial problems. Colonial went into bankruptcy before a deal could be negotiated.

On May 11, 1990, Autuori contacted an Andersen partner from North Carolina named Bradley Gabosch and sent him a memorandum praising Colonial's financial status and reputation. Finally, Autuori wrote letters to two banks in late May and early June on behalf of Colonial, which included similar upbeat characterizations. No financing agreements resulted from Autuori's efforts with the banks.

### DISCUSSION

#### A. Jurisdiction

■ We have jurisdiction over the government's appeal pursuant to 18 U.S.C. § 3731. The Double Jeopardy Clause presents no bar to the review of an acquittal based upon the insufficiency of the evidence and granted following a jury verdict of guilty. *See United States v. Covino*, 837 F.2d 65, 67 (2d Cir.1988).

#### B. Judgment of Acquittal

##### 1. *Standard of Review*

■ We review *de novo* the district court's conclusion that the evidence was insufficient to support Autuori's conviction. *See United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999). Thus, we apply the same standard of review to Autuori's motion for judgment of acquittal that the district court did in the first instance. *See id.* In so doing, we view the evidence presented in the light most favorable to the government, and we draw all reasonable inferences in its favor. *See United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir.1991). Furthermore, we consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir.1993).

■ "[T]he court must be careful to avoid usurping the role of the jury." *Guadagna*, 183 F.3d at 129. We may not substitute our own determinations of credibility or relative weight of the evidence for that of the jury. We "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972)) (internal quotation marks omitted). "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Guadagna*, 183 F.3d at 129 (quoting *Curley v. United States*, 160 F.2d 229, 233 (D.C.Cir.1947)) (first alteration added).

■ With these principles in mind, we must uphold the jury's verdict if we find that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In short, a defendant shoulders a "heavy burden" in challenging the sufficiency of evidence supporting a conviction. *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir.1994).

*2. Elements*

■ The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires. *See United States v. Zagari*, 111 F.3d 307, 327 (2d Cir.1997). The latter two elements were not contested by Autuori. Because the only distinction between mail fraud and wire fraud appears in the third element, which is not at issue here, our analysis applies to all sixteen counts. *See United States v. Slevin*, 106 F.3d 1086, 1088 (2d Cir.1996).

■ As to the first element, the government was required to prove (i) the existence of a scheme to defraud, *see United States v. D'Amato*, 39 F.3d 1249, 1256–57 (2d Cir.1994), (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, *see id.* at 1257, and (iii) the materiality of the misrepresentations, *see Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

*3. Scheme to Defraud*

■ The mail and wire fraud statutes do not define "scheme to defraud," but it has been described as a plan to deprive a person "of something of value by trick, deceit, chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)) (internal quotation marks omitted). It is characterized by a departure from community standards of "fair play and candid dealings." *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir.1992) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987)) (internal quotation marks omitted).

■ We agree with the district court that there was sufficient evidence to support the jury's conclusion that there was a scheme to defraud the Partnership investors. Although there is no direct evidence of the scheme, the government may meet its burden on this element through circumstantial evidence. *See D'Amato*, 39 F.3d at 1256. And a rational juror could reasonably infer from the circumstantial evidence presented at Autuori's trial that a scheme to defraud existed.

■ The most telling circumstance is Colonial's destruction or diversion of the disclosure letters and PPM amendments following the April 20 meeting at Tarlow Levy. Colonial was categorically advised that the original PPM contained materially misleading representations, yet Colonial carried on marketing the Partnership and the Constitution Zeros without necessary disclosure. Although Googel and Kaiser gave conflicting testimony about why the rescission letters went unmailed, there is sufficient evidence that the required disclosures were intentionally never made.

The evidence is also sufficient to show a scheme to defraud in the period of the indictment that precedes the April 20 meeting. The marketing of Partnership participations and Constitution Zeros went forward without disclosure of highly material deviations from the information in the PPM. The eight-month audit of Constitution Plaza showed that the net operating income for 1989 was $3 million below the PPM projections, and the Management Company budget confirmed that this variance was continuing. Autuori (and Andersen) continued to invite reliance on the PPM projections despite their knowledge of the below-expectation actuals. To facilitate that dishonesty, Autuori recommended that Colonial get another auditor. The marketing continued, without further disclosures, while CBT demanded repayment on its lines of credit and other financial warning flags were raised. Finally, Googel and his partners were marketing their investments to unions through bribery. Because we view the evidence in its totality, *see Rosenthal*, 9 F.3d at 1024, we conclude that the combination of this evidence was sufficient for a rational juror to find that a scheme to defraud existed

throughout the time period charged in the indictment.

### 4. Scienter

■ "Essential to a scheme to defraud is fraudulent intent." *D'Amato*, 39 F.3d at 1257. "It is not sufficient that [the] defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims. Instead, the proof must demonstrate that the defendant had a 'conscious knowing intent to defraud ... [and] that the defendant contemplated or intended some harm to the property rights of the victim.'" *Guadagna*, 183 F.3d at 129 (citation omitted) (quoting *United States v. Leonard*, 61 F.3d 1181, 1187 (5th Cir. 1995)); *see United States v. Gabriel*, 125 F.3d 89, 97 (2d Cir.1997). The government may prove fraudulent intent through circumstantial evidence. *See Guadagna*, 183 F.3d at 129. We conclude that the evidence, considered together and in the light most favorable to the government, is sufficient to establish scienter.

■ The jury could reasonably infer that Autuori was aware of the misrepresentations in the PPM prior to the March 1990 sales presentations to Talley, Morgan and the Albany Union. In October 1989, he learned from the eight-month audit that Colonial's net operating income in 1989 was $3 million short of the predictions for 1990 contained in the PPM. Sales of the Partnership shares were slower than expected and did not sell out by the date proposed in the PPM. This failure reduced Colonial's anticipated interest income and impaired its ability to repay its short term financing. Autuori told former Assistant Connecticut Attorney General John Brunjes in a 1992 interview that the disappointing sales of the Partnership shares meant that Colonial "didn't have the reserves needed to weather the storm." In addition, Autuori knew the real estate and banking markets in New England were in a downturn. In early January 1990, Goo-

gel told Autuori that CBT had called in Colonial's lines of credit, thus putting further pressure on Colonial's already constricted cash flow. In January 1990, Autuori suggested to Googel that Colonial should switch auditors in order to allow Autuori and Andersen to continue casting a blind eye to the discredited assumptions in the PPM. During a February sales trip to Florida, Googel told Autuori about the bribe Colonial paid to Lopreato to facilitate the sale of the Constitution Zeros to unions. On March 1, 1990 (days before he participated in the sales meetings with Talley, Morgan and the Albany Union), Autuori learned that the Management Company budget confirmed what Autuori had known since the previous October: Colonial was failing in its strategy—critical to the PPM projections—of increasing parking revenues while lowering cleaning expenses. Autuori understood, and had discussed with Krichavsky, the downturn in the real estate market and Colonial's apparent inability to meet the PPM projections.

Against this backdrop, Autuori began his efforts in March to market the Constitution Plaza project. He vouched for Colonial's financial situation despite his knowledge that CBT was demanding repayment and Ermler had been hired to alleviate Colonial's financial problems. He assured investors that the PPM numbers were reliable despite his knowledge that the actual numbers were substantially below expectations. A rational juror, after considering Autuori's knowledge of the Partnership's problems and Autuori's conduct in the sales meetings, could infer that he willfully participated in a scheme to defraud.

The evidence of scienter was reinforced by the March 29, 1990 letter from Cohan concluding that the PPM was misleading, and by the April 20 meeting with the Tarlow Levy attorneys.[6] By that point,

---

6. Autuori argues that he did not know that the variances and misrepresentations were

material until he received a legal opinion at the April 20 meeting, and he was therefore

Autuori unambiguously knew that the PPM was inaccurate in material ways. Autuori argues that he could not have intended to participate in any fraud following the meeting because he believed the rescission and disclosure letters were sent to all investors. But the jury could find that Autuori knew the letters were never sent out, because he made subsequent representations to Gates and Feinberg that would have been untenable if they (as potential investors) had received the necessary information. Further, Autuori was present at meetings with IDG and potential investors in which Googel continued to rely on the no-longer-tenable PPM forecasts. Moreover, a rational juror could infer from his post-April 20 behavior that, even if he believed that the disclosures had been mailed, he knowingly concealed other material information about the Partnership project and Colonial's financial condition.

■ The district court found this evidence insufficient to prove the requisite scienter beyond a reasonable doubt:

> All of the evidence falls into one of two categories. Either government witnesses undermined the Government's theory that the Defendant must have known about a scheme to defraud by testifying that a given fact, pointed to by the Government as a red flag, was no cause for alarm, or the testimony between Googel and other government witnesses was so hopelessly conflicted that no reasonable inferences of knowledge or intent could be drawn therefrom.

*Autuori*, 1998 WL 774232, at *20. In this passage, the court impermissibly judged the credibility of witnesses, weighed the significance of evidence, and resolved conflicts in testimony against the verdict.

In the court's "red flag" category, the court cited testimony by Krichavsky, Ermler and Kostin that the eight-month audit,

the Management Company budget and the other supposed red flags gave "no cause for alarm." But the jury could have relied on conflicting testimony to find otherwise. Former Assistant Connecticut Attorney General Brunjes testified that Autuori and Krichavsky both saw red flags in the data on actuals. While Andersen had originally approved the PPM in light of Colonial's track record of efficient management, Autuori explained to Brunjes that by March 1990, "there's a new environment, that the deal is not raising enough equity fast enough so that's a key assumption because it goes into the reserves for operating expenses and that none of the reserves are getting filled and the banks started calling in their lines of credit." The district court did not consider Brunjes's testimony and impermissibly weighed the evidence to conclude that there was insufficient proof of Autuori's knowledge of the scheme to defraud. *See United States v. Tocco*, 135 F.3d 116, 123 (2d Cir.1998) (stating that courts must "defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences").

Nor do we think that the district court could discount Googel's testimony. For example, the court noted that while Googel claimed that Ermler was present when Autuori advised Colonial to change auditors, Ermler denied that such a meeting took place. *See Autuori*, 1998 WL 774232, at *21. This conflicting testimony, the court argued, left the jury without a reasonable basis to infer Autuori suggested the change. We disagree. First, Ermler's testimony is not a direct refutation of the inference that Autuori suggested the change, though it raises a question about who was present when he did so. Second, even if Ermler's testimony posed a direct conflict to Googel's, such a conflict on a

---

under no obligation to make disclosures during his marketing activities in March (the conduct underlying Counts 1–2 and 11–16). But a legal opinion is not required to establish fraudulent scienter. Prior to the April 20

meeting, Autuori had information sufficient to justify the factual finding that he appreciated the importance of the information withheld, even prior to receiving a legal opinion.

Rule 29 motion must be resolved in favor of the verdict. "Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility." *United States v. Payton,* 159 F.3d 49, 56 (2d Cir.1998).

Similarly, the court discounted Googel's testimony that he told Autuori about the Lopreato bribe, because that testimony was "somewhat compromised" by Googel's failure to mention Autuori's name in prior interviews with the government. *Autuori,* 1998 WL 774232, at *22. In discounting this testimony, however, the court was impermissibly weighing evidence.

■ We see what the district court sees; there are serious contradictions and conflicts in the government's evidence. *See infra* Part C.2. But Autuori had the opportunity to convince the jury that Googel was not credible, and in that work his counsel had an arsenal to call upon. It is not for the court on a Rule 29 motion to make credibility determinations: "[A] trial judge [is] not entitled to set aside [a] guilty verdict simply because he would have reached a different result if he had been the fact-finder." *United States v. Cunningham,* 723 F.2d 217, 232 (2d Cir.1983). Upon our review of the evidence, we conclude that a rational juror could infer beyond a reasonable doubt that Autuori had the requisite scienter to support his conviction of wire and mail fraud.

### 5. *Materiality*

■ "[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt,* 31 F.3d 1208, 1217 (2d Cir.1994). The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose. *See United States v. Altman,* 48

F.3d 96, 102 (2d Cir.1995). "[U]nder the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *United States v. Townley,* 665 F.2d 579, 585 (5th Cir.1982).

The district court concluded that any affirmative misrepresentations made by Autuori were merely immaterial puffing, and that any omissions were not fraudulent because Autuori had no fiduciary duty to the alleged victims. We disagree: (i) a rational juror could infer that Autuori's affirmative representations to Talley, Albany Union, Gates and the potential financing sources were materially misleading; (ii) as a matter of law, a duty to disclose can arise from circumstances other than a fiduciary relationship; and (iii) a rational juror could infer that Autuori had and breached a duty to disclose material information at those meetings.

Accordingly, we reverse the judgment of acquittal as to Counts 1, 3–10 and 14–16. However, as to Counts 2 and 11–13, which relate to Autuori's meeting with Morgan, we affirm the dismissal on the ground that no rational juror could conclude beyond a reasonable doubt that Autuori's statements or omissions were materially misleading. Our count-by-count analysis is as follows.

#### a. *Counts 1, 3–10 and 14–16*

##### i) *Affirmative Representations*

■ Autuori made several affirmative representations to potential investors that a reasonable juror could find materially misleading. He represented to Talley that the PPM forecasts were "good" and "credible" even though he already had knowledge of the variances in the eight-month audit and the Management Company budget. In his meeting with the Albany Union officials, Autuori described the Partnership project as "safe" and despite his concerns about Colonial's inability to meet its projections, the skidding real estate

market, and Colonial's own financial woes, Autuori assured the officials that Andersen "stood behind the numbers." Even after the April 20 meeting, Autuori told Gates that the actual numbers approximated the projections and that the real estate market was a growth area.

The district court characterized these statements as puffing, or sales tactics. *See Autuori,* 1998 WL 774232, at *26 (citing *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1179–80 (2d Cir.1970)). But the jury could infer that Autuori's statements were representations that contradicted his honest view. *See United States v. Amrep Corp.,* 560 F.2d 539, 543–44 (2d Cir.1977) (holding that a representation about a "safe and profitable investment" violated the mail fraud statute because "[t]he expression of an opinion not honestly entertained is a factual misrepresentation"); *see also Altman,* 48 F.3d at 101 (noting that the Supreme Court "early on gave the scheme to defraud element a broad interpretation, construing it to 'include everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future'" (quoting *Durland v. United States,* 161 U.S. 306, 313, 16 S.Ct. 508, 40 L.Ed. 709 (1896)) (alteration omitted)). Additionally, the jury could find that Autuori knew that he spoke with the weight of Andersen's expertise. Indeed, all the investors testified that the imprimatur of Andersen was an important reason for their decision to invest in the Partnership project. The jury could find that Autuori's misrepresentations as to the validity of the PPM projections, especially in light of his prestige as an Andersen accountant, were more than puffery, and that they were material misrepresentations.

### ii) *Omissions*

The district court concluded that the evidence of fraudulent omissions was insufficient because Autuori was not a fiduciary to any of the investors. *See Autuori,* 1998 WL 774232, at *25. True, an omission can violate the fraud statute only in the context of a duty to disclose; but a *fiduciary* duty is not the *sine qua non* of fraudulent omissions. *See United States v. Sancho,* 157 F.3d 918, 920 (2d Cir.1998) (per curiam) ("Nothing in ... § 1343 ... indicates that the existence of an actual fiduciary duty is a necessary element of the crime."); *see also United States v. Keplinger,* 776 F.2d 678, 698 (7th Cir. 1985); *United States v. Allen,* 554 F.2d 398, 410 (10th Cir.1977). A duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading. *See Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1484 (2d Cir.1995).

Thus, even if the affirmative representations were not material in and of themselves, the jury certainly could conclude that because Autuori did not disclose his knowledge of the state of affairs at the Partnership and Colonial, his upbeat statements were misleading by their incompleteness. Thus he vouched for the validity of the PPM forecasts without mentioning the variances in the actual numbers. Autuori told Talley that parking and rental income could be increased, which was theoretically true in the sense that the incomes *could* be boosted. However, having said that, Autuori's failure to disclose that the income levels were thus far significantly below PPM expectations was a material misrepresentation. Similarly, Autuori's representations to IDG and to his partners in Andersen's North Carolina and San Francisco offices regarding Colonial's financial reputation created a duty to disclose Colonial's recent financial difficulties.

### b. *Counts 2 and 11–13*

Counts 2 and 11–13 charged Autuori with mail and wire fraud in connection with his March 12, 1990 meeting with Morgan. We conclude that the evidence was insufficient to support the jury's ver-

dict because there was no proof as to what, if anything, Autuori actually said at the meeting. (We will assume that the government sufficiently proved that Autuori actually attended the meeting—an uphill issue for the government.) The government relies on the testimony of Morgan and Kent as the only evidence of Autuori's conduct at the meeting. But Morgan could recall no representations that Autuori made. Morgan's only testimony was that an unidentified Andersen representative discussed the financial aspects of the project and that no one raised concerns over the validity of the PPM forecasts. Kent's testimony is unavailing because he left the meeting before Autuori is supposed to have begun his presentation and therefore did not hear Autuori say anything, much less anything materially misleading.

On this evidence, the jury could not reasonably conclude that Autuori made affirmative misrepresentations. Nor does the evidence support a reasonable inference that Autuori made incomplete or ambiguous statements giving rise to a duty to disclose the material information about the Partnership project. To convict, the government had to present evidence that Autuori actually participated in the scheme to defraud. "The jury may not be permitted to conjecture merely, or to conclude upon pure speculation...." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C.Cir.1947)) (internal quotation marks omitted). We agree with the district court that no rational juror could find on this evidence that Autuori committed fraud in connection with the Morgan meeting, and we therefore affirm the judgment of acquittal as to Counts 2 and 11–13.

### C. New Trial

By way of alternative relief, the district court granted conditionally Autuori's motion for a new trial pursuant to Fed. R.Crim.P. 29(d). Because we affirm the judgment of acquittal as to Counts 2 and 11–13, the government's appeal of that ruling is moot as to those counts. It is alive, however, as to the remaining counts. Upon our review of the record, we conclude that the district court properly exercised its discretion to grant a new trial, and we therefore affirm.

### 1. Standard of Review

 We review the grant of a new trial for abuse of discretion. *See United States v. Scotti*, 47 F.3d 1237, 1241 (2d Cir.1995). "[T]he court may grant a new trial to [a] defendant if the interests of justice so require." Fed.R.Crim.P. 33; *see United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998) (noting that a new trial is proper when a district court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir.1988)) (internal quotation marks omitted)). In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses. *See United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992). At the same time, the court may not wholly usurp the jury's role. "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* at 1414.

### 2. Analysis

 The district court based its decision on the dubious testimony of two of the government's main witnesses, Googel and Gates. *See Autuori*, 1998 WL 774232, at *30–*32. The core of the government's case was the testimony of Googel, an artful and commercially successful liar. His testimony was riddled with inconsistency and was often contradicted by other government witnesses. For example, Googel testified that Autuori attended the "side meeting" after the April 20 meeting. This was contradicted by every other witness. Kostin and Ermler denied that a side meeting took place. Krichavsky testified

that he went to lunch with Autuori, so they could not have attended a side meeting. Googel conceded that in previous testimony before the Securities and Exchange Commission, he could not remember if Autuori attended the meeting.

Gates's testimony was also problematic. Gates testified that Autuori gave him a misleading spreadsheet, but the due diligence report he wrote made no mention of the spreadsheet, or of Autuori's positive representations based on it. Gates says he sent the spreadsheet to the government, but the prosecution cannot find it and does not recall Gates mentioning it. His credibility is also drawn into question by his comment to his investors after Colonial's bankruptcy: "It is interesting to note that if fraud from inception were to be the case, then the deep pockets in the situation would probably be Arthur Andersen & Company. . . . "

Within limits of discretion, the district court may evaluate witness credibility and draw some inferences against the government in deciding whether a new trial is warranted. *See Sanchez,* 969 F.2d at 1413. The district court has set forth meticulously the testimony and circumstances that support its exercise of discretion. Having traversed the same ground, guided by the district court's observations and analysis, we agree that the credibility of the principal witnesses was weak and that the soundness of the verdict is highly doubtful. We therefore conclude that it was no abuse of the district court's discretion to order a new trial.

### CONCLUSION

For the foregoing reasons, the judgment of acquittal is affirmed as to Counts 2 and 11–13; as to Counts 1, 3–10 and 14–16, the judgment of acquittal is reversed, the conditional grant of a new trial is affirmed, and the case is remanded for further proceedings.