**UNITED STATES of America,**
**Appellant–Cross–Appellee,**

v.

**Elbio ESPAILLET and Martin Calderon, Defendants,**

Gerald Alfonso, Defendant–Appellee–
Cross–Appellant.

Docket Nos. 03–1202(L), 03–1277(XAP).

United States Court of Appeals,
Second Circuit.

Argued March 8, 2004.

Decided Aug. 18, 2004.

Helen Cantwell, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, Celeste L. Koeleveld, Assistant United States Attorney, on the brief), New York, N.Y. for Appellant–Cross–Appellee.

Richard E. Signorelli, New York, N.Y. for Defendant–Appellee–Cross–Appellant.

Before: WALKER, Chief Judge, CARDAMONE, KEITH,[1] Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

The government appeals the judgment of the United States District Court for the Southern District of New York (Kimba M. Wood, *District Judge*), granting defendant Gerald Alfonso's motion for an acquittal notwithstanding the verdict, pursuant to Federal Rule of Criminal Procedure 29. The district court found that the government's evidence was insufficient to prove Alfonso's knowledge of and intent to participate in a cocaine conspiracy in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846, violations the jury found beyond a reasonable doubt. Finding the evidence sufficient to support the jury's verdict upon our *de novo* review, we reverse the district court's judgment and reinstate the jury verdict.

Alfonso cross-appeals the district court's order insofar as it denied him a conditional new trial if we reinstated the jury verdict. Finding no abuse of discretion in this decision, we affirm this aspect of the district court's decision.

### THE GOVERNMENT'S APPEAL

#### I. FACTS

Because the appeal turns on whether there was sufficient evidence from which a jury could conclude that Alfonso joined co-defendants Elbio Espaillet and Martin Calderon in a conspiracy to distribute narcotics and the possession of narcotics with intent to distribute them, we recite the facts of this case in some detail.

After a cooperating witness, Daisi Torres, was unsuccessful in getting Espaillet to sell her drugs, Torres told Espaillet that she had a male friend who wanted to buy cocaine and ecstasy. On April 3, 2002, Torres and the "male friend," in reality Drug Enforcement Agency ("DEA") informant Rene Rodriguez, met at the DEA offices where Torres called Espaillet and arranged to introduce her "friend" to him that afternoon.

---

1. The Honorable Damon J. Keith, of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

After that call but before the meeting, Espaillet paged Calderon at 2:42 p.m. Nine minutes later, a call was placed to Espaillet (presumably by Calderon) on a cellular telephone regularly used by Alfonso.[2] Within the next hour, three more calls were made between the cellular telephones belonging to Espaillet and Alfonso. Other than Espaillet's original page to Calderon, neither Espaillet's nor Alfonso's cellular telephones paged Calderon nor called Alfonso's home.

*The meeting with Espaillet*

At about 3:45, Torres and Rodriguez, who was wearing a recording device, met Espaillet at a particular Gaseteria gas station in upper Manhattan. After discussing deals in both cocaine and ecstasy, Espaillet told Rodriguez that he had a kilogram of cocaine presently available. Espaillet then placed a call on his cellular telephone to his self-described "source," commenting to Rodriguez, "they come from far." He offered the kilogram to Rodriguez for $23,000. During the discussions, Espaillet told Rodriguez that he would be able to test the cocaine. While Rodriguez pretended to call the person holding the money, Espaillet spoke to his "source." Both Espaillet and Rodriguez then exchanged various telephone numbers.

After Rodriguez expressed interest in the deal, Espaillet pressed for a second meeting within 30 to 45 minutes. The tape of the conversation was partly unintelligible, but Rodriguez testified that he understood that he would be a lone buyer while three people would be on the selling side. At the meeting, he said to Espaillet "it's gonna be ... it's gonna be three niggers for one nigger. You know what I'm saying?" At trial, Rodriguez said he used the term "nigger" to refer to "homeboys, guys, friends [and] buddies." Espaillet offered reassurance: "You don't got to worry or nothin' 'cause, 'cause I'm going to have my shit there and I'll give you ... you can touch it, you can do whatever." Espaillet also suggested the Gaseteria as a meeting place or "wherever you say." During the meeting, Espaillet's cellular telephone called Alfonso's cellular telephone at 3:51 p.m. Thereafter, until 5:04 p.m., two more calls were made between Alfonso's cellular telephone and Espaillet's cellular telephone.

*Subsequent telephone calls*

The meeting between Rodriguez and Espaillet presumably ended before 4:50 p.m. because that time marked the first of a series of calls and pages to numbers provided by Rodriguez; sixteen calls or pages were placed to Rodriguez, until 6:37 p.m., from the cellular telephones belonging to Espaillet and Alfonso.

At some point, Rodriguez returned the calls and pages by calling Espaillet from a pay phone. Espaillet said he wanted to do the deal that night. Rodriguez, following guidance from DEA, tried to delay the transaction until the next day by telling Espaillet that he only had $18,000 of the $23,000 purchase price. Espaillet replied that Rodriguez could pay him the $5,000 balance the following day.

Thereafter, Rodriguez met with a DEA agent and, at about 6:37 p.m,[3] had a recorded telephone conversation with Espaillet. When Rodriguez said he would meet

---

2. The cellular telephone recovered from Alfonso's car on April 3, and ultimately returned to his family, was subscribed in the name of "Derrick Machado." It paged Calderon four times on the evening of April 2, 2002. For ease of reference, and because Alfonso doesn't materially dispute that the cellular telephone was his, we refer to this phone as Alfonso's.

3. There is a possibility that this call occurred at 7:38 p.m. but, unlike the 6:37 p.m. call, Espaillet's telephone does not reflect an incoming call.

him in 35–45 minutes, Espaillet responded: "I can't wait that long, because I got my people with that shit here. You know? And they ... they can't wait that long; they got things to do man."

Calderon then got on the phone with Rodriguez and asked, "Is this a sure thing or what?" After Rodriguez reiterated to Calderon that he was still short some of the money but could pay the balance the next morning, Calderon stated "O.K. 'Cause I got this shit in the car, I got my boy in the car with me ...." Rodriguez testified to his understanding that this was a reference to the kilogram of cocaine. Rodriguez indicated that he wanted to inspect the drugs. Calderon responded: "It's all sealed up still. I'll open it up for you, bro. You can look at it as much as you'd like."

*The meeting at which the transaction took place*

At about 8:00 p.m., Rodriguez arrived at the Gaseteria, the pre-arranged meeting place, wearing a recording device. Thereafter, a dark car with tinted windows pulled in and backed into a parking space. After ten minutes Espaillet emerged, went to Rodriguez, and took him to the car. Rodriguez entered the rear seat on the passenger side; Espaillet was next to him on the rear seat. Calderon was in the right passenger seat and appellee Alfonso sat in the driver's seat. Rodriguez described Alfonso as wearing a hooded sweatshirt and looking from side to side and at Rodriguez in the rear view mirror.

Upon entering the car, Rodriguez asked about the availability of ecstasy pills, to which Calderon replied, in substance, that they could be obtained. Rodriguez then, referring to the cocaine, asked: "You show it to me ... show it to me." Calderon reached down "from underneath him," pulled out a brick-shaped package, and held it between the two front seats occupied by Calderon and Alfonso. The package was a white powdery substance wrapped in tape, with a small open flap on top. Rodriguez testified that it looked like a "kilo[gram] of cocaine." After Calderon invited Rodriguez to "check it out as much as you'd like," Rodriguez put his finger in the opening near the flap and pretended to taste what he thought looked like cocaine. At this point, all three of the selling group looked at Rodriguez while he pretended to taste the cocaine. Rodriguez testified that each wore an expression of "[l]ike surprise, like in shock, like worried." He further testified that they "were looking at [him], like, in the face. [He] could tell like they were surprised in that the moment when [he] was trying to taste it ... the face of the three guys they looked like they were scared like something is happening that moment."

After Rodriguez said he would make the purchase, Calderon returned the package "underneath his feet where he had it before." Rodriguez then observed Alfonso talking on a cellular telephone and whispering to Calderon. When Calderon offered to meet on Riverside Drive to collect the money, Rodriguez declined the offer, said he would be right back, and left the car. He then gave an arrest signal and DEA agents arrested Alfonso, Calderon, and Espaillet while they were still in the car. An agent recovered the package, described by another agent as brick-shaped. The parties stipulated that it contained one gram of cocaine or less with the remainder a non-narcotic substance. Alfonso did not testify or present any evidence at trial.

*The jury verdict*

The jury, after one day of deliberation, convicted Alfonso on two counts: (i) conspiracy to distribute and possess with the intent to distribute cocaine; and (ii) distributing and possessing with intent to distribute cocaine. The jury acquitted Alfonso on a third count: conspiracy to steal

money and property belonging to the United States.

*The Rule 29 motion*

The district court granted Alfonso's Rule 29 motion, which claimed that the evidence was insufficient to prove that he knew that the brick-shaped package in the car contained cocaine. He argued in his Rule 29 motion that there was an "equal inference" that he had been "duped" by his co-defendants.

The government appeals.

## II. DISCUSSION

We review the district court's judgment of acquittal notwithstanding the verdict *de novo*. *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir.2002). In reviewing an acquittal by the district court following a jury verdict of guilty, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In this regard, the defendant who is challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir.2003) (internal quotation marks omitted). "[A] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir.1999) (internal quotation marks omitted).

In applying these principles, it is the court's duty to "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir.1999) (internal quotation marks omitted). It is irrelevant that the judge conducting such a review personally feels that he or she would not have found guilt upon such evidence. The conviction must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130. "The government's case need not exclude every possible hypothesis of innocence ...." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (internal quotation marks omitted). Thus, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir.2000) (internal quotation marks omitted; alteration in original). Furthermore, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir.2003). It is settled that "Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of ... the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129 (internal quotation marks omitted; alteration in original).

In this case, the sole question upon the Rule 29(c) motion was whether, applying the foregoing principles, the evidence was sufficient to support the jury's finding that Alfonso knew that the package that was shown to Rodriguez in the car on the evening of April 3, 2002 contained cocaine, as the jury found. After searching the record, we believe that it was and, accordingly, reverse the judgment of the district court and reinstate the jury verdict.

Alfonso argues that the evidence against him was insufficient because there is no evidence that he knew of the scheme which was, in substance, to defraud the buyer by

selling a fake package of cocaine with a small amount of cocaine in it, placed at the top to avoid detection of the fake cocaine by the taster. We disagree. Upon reviewing the evidence as a whole and drawing permissible inferences in the government's favor, we conclude that there was sufficient evidence for the jury to reach the verdict it did.

■ Although, in the run-up to the final meeting, there was no direct evidence of Alfonso's participation in the form of eyewitness testimony, as there was against Espaillet and Calderon, there was substantial circumstantial evidence. Such evidence, of course, is of no less intrinsic worth than direct evidence and, indeed, circumstantial evidence alone may support a guilty verdict. *See Martinez*, 54 F.3d at 1043.

Only two cellular telephones were used by the alleged co-conspirators prior to the meeting. One belonged to Espaillet; the other was recovered from and returned to Alfonso. The only pager used belonged to Calderon. When Espaillet initially paged Calderon at 2:42 p.m., the return call minutes later was from Alfonso's cellular telephone. From this the jury could infer that either Alfonso himself replied to the paging of Calderon at the latter's request or, more probably, that Alfonso loaned his telephone to Calderon for that purpose but that, in any event, the two of them were together at the time. Alfonso's cellular telephone was involved in three calls shortly thereafter.

The inference that Alfonso and Calderon were together throughout the afternoon and early evening is supported by the evidence of the sixteen pages or calls from Espaillet's and Alfonso's telephones to Rodriguez before 6:37 p.m. Moreover, when Espaillet met in person with Torres and Rodriguez at 3:45 p.m., although portions of the recorded conversation were unintelligible, Rodriguez was plainly led to

believe that three people would be on the selling side. He told Espaillet of his concern that "it's gonna be ... it's gonna be three niggers for one nigger. You know what I'm saying?" And then, in a later recorded telephone conversation in which Rodriguez participated with Espaillet and Calderon, Espaillet referred to his source in the plural: "I can't wait that long, because I got my people with that shit here. You know? And they ... they can't wait that long; they got other things to do man."

Further circumstantial proof from the telephone calls warranted a fair inference that all three alleged co-conspirators were together from shortly after 5:04 p.m. That is the last time there is a phone call between Espaillet's cellular telephone and Alfonso's telephone. Thereafter, until the time of the pre-meeting telephone conversation, from 5:08 p.m. to 6:37 p.m., calls and pages are made exclusively to Rodriguez from both cellular telephones. Neither cellular phone called the other, nor were calls made to any other outside number.

When this evidence is combined with the recorded pre-meeting telephone conversation at approximately 6:37 p.m. between Rodriguez, Espaillet, and Calderon in which Espaillet says, "I got my people with that shit here," and Alfonso's presence in the car at the final meeting with the others a little more than an hour later, the jury was entitled to infer that Alfonso was in the car with Espaillet and Calderon throughout the late afternoon, including at 6:37 p.m., when the latter two engaged in an extensive drug conversation with Rodriguez over the telephone.

Rodriguez supplied direct evidence of the final meeting that tied Alfonso to the proposed transaction, at which the cocaine was displayed. Alfonso drove his car to the meeting, with Espaillet and Calderon

as passengers, and acted as a lookout would, looking from side to side and in the rear view mirror, while the others conversed about ecstasy and cocaine (even though he did look at Rodriguez during the tasting). When Calderon produced the package and Rodriguez put his finger in the brick-shaped package to taste the substance, Alfonso, like Espaillet and Calderon, expressed "[l]ike surprise, like in shock, like worried," "like they were scared like something is happening that moment."

In sum, the jury could fairly infer that Alfonso possessed a cellular telephone used during and in furtherance of the conspiracy; obtained a car with tinted windows;[4] was with Espaillet and Calderon in the car in the late afternoon until the final meeting; saw the brick being placed under the front passenger seat of the car; overheard the drug conversation between Espaillet, Calderon, and Rodriguez at 6:37 p.m.; drove the car with Espaillet and Calderon aboard into a position at the Gaseteria that afforded a full view and, if necessary, would facilitate a quick exit; waited 10 minutes before contact was made with Rodriguez; and acted as a lookout while the meeting took place. Finally, the jury could have concluded that Alfonso diverted his attention from his lookout responsibilities long enough to see Calderon show the package to Rodriguez and to check out whether Rodriguez would be satisfied with his taste-test for drugs. We think that these facts were more than sufficient to permit a jury to conclude beyond a reasonable doubt that Alfonso was in no sense an innocent bystander and that he, no less than Espaillet or Calderon, knew the key circumstances of the transaction in which he was an active participant.

For these reasons, we REVERSE the district court's grant of Alfonso's Rule 29 motion for an acquittal, notwithstanding the jury verdict against him. We reinstate the jury's verdict.

### ALFONSO'S CROSS APPEAL

In its order of acquittal for Alfonso, the district court, pursuant to Rule 29(d)(1), denied Alfonso's simultaneous motion for a conditional new trial in the event of reversal on appeal. The district court emphasized that it had "weighed the evidence and evaluated the credibility ⁄of witnesses at trial," and concluded, "based on that assessment," that "the government's evidence was not so unreliable as to call into question the credibility or integrity of the government's proof." Accordingly, the district court determined that "no extraordinary circumstance ... would warrant a new trial" under Fed.R.Crim.P. 29(d)(3)(B).

■■■■ We review the district court's denial of a new trial motion under Fed.R.Crim.P. 29(d) for an abuse of discretion. *See Autuori*, 212 F.3d at 120. "[T]he court may ... grant a new trial [to a defendant] if the interest of justice so requires." Fed.R.Crim.P. 33(a). In exercising its discretion, the district court may weigh the evidence and credibility of witnesses, *see United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992), but may not wholly usurp the jury's role: "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* at 1414.

■■■ Applying these principles, we conclude that the district court did not abuse its discretion in denying Alfonso's condi-

---

**4.** It was also stipulated that the car that Alfonso was driving was obtained from Alfonso's relative.

tional new trial motion. Although the district court thought the government's evidence was legally insufficient to support the verdict, it was within its discretion to decide that if the court of appeals disagreed with its judgment of acquittal, the interests of justice did not require a new trial after our reversal. Accordingly, we AFFIRM that aspect of the district court's judgment.

## CONCLUSION

For the foregoing reasons, the district court's judgment of acquittal notwithstanding the jury verdict is REVERSED; the jury's verdict is reinstated; and the district court's ruling on Alfonso's new trial motion is AFFIRMED.