**UNITED STATES of America, Plaintiff,**

v.

**UNITED IMPORTS CORP., d/b/a M.D. Electronics, David Abboud, Joseph Abboud, Baron Abboud, Gene Abboud, G & A Distributing, Inc., d/b/a Broadway Enterprises, Susan Germer, and Infinite Electronics, Defendants.**

**No. 99–CR–80.**

United States District Court,
D. Nebraska.

Nov. 30, 2000.

Alan G. Stoler, Omaha, NE, for David Abboud.

Kirk E. Naylor, Jr., Naylor Law Firm, Lincoln, NE, for Joseph Abboud.

Robert B. Creager, Anderson, Craeger Law Firm, Lincoln, NE, Leslie D. Ware, Monts, Ware Law Firm, Dallas, TX, for Baron Abboud.

Edward L. Wintroub, Wintroub, Rinden Law Firm, Omaha, NE, for Gene Abboud, G & A Distributing, Inc.

Dana C. Bradford, III, Bradford, Coenen Law Firm, Omaha, NE, for Susan Germer, Infinite Electronics.

Richard A. Ripley, Howrey, Simon Law Firm, Washington, DC, for Martin J. Weinstein.

Russell X. Mayer, Assist. U.S. Attorney, Omaha, NE, for U.S.

## MEMORANDUM AND ORDER

STROM, Senior District Judge.

This matter is before the Court on the motions to dismiss filed by David Abboud, Baron Abboud, and Joseph Abboud (Filing Nos. 141, 145, 150). Following a hearing held on April 4, 2000, the magistrate judge recommended that the motions to dismiss be granted (Filing No. 241). The government and Joseph Abboud filed timely statements of objection to the magistrate judge's report and recommendation (Filing

Nos. 257, 247). In addition, defendants Susan Germer and Infinite Electronics, and Gene Abboud and G & A Distributing filed motions to join the other defendants' motions to dismiss (Filing Nos. 250 and 254). These motions to join will be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has conducted a *de novo* review of defendants' motions, the transcript of the April 4, 2000, hearing (Filing No. 222), the briefs submitted by the parties, and the applicable law, and now finds the magistrate judge's report and recommendation should be rejected and defendants' motions to dismiss denied.

## I. BACKGROUND AND STANDARD

For purposes of this order, the Court adopts the background and history as set forth by the magistrate judge in her report and recommendation (Filing No. 241). A magistrate judge's report and recommendation to which objections are made is reviewed *de novo*. 28 U.S.C. § 636(b)(1)(C).

## II. DISCUSSION

The defendants' motions to dismiss allege that the Superseding Indictment ("SI") does not allege all the elements of the crimes with which the defendants are charged. Omissions from an indictment are only fatal when the missing element is "of substance" rather than "of form." *United States v. Mallen*, 843 F.2d 1096, 1102 (8th Cir.1988). Generally, an indictment is considered sufficient "if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Summers*, 137 F.3d 597, 601 (8th Cir.1998) (citations omitted).[1] Finally, an indictment should not be read in a hyper-technical manner and is deemed sufficient unless no reasonable construction can support the charge. *United States v. Morris*, 18 F.3d 562, 568 (8th Cir.1994).

### A. Mail and Wire Fraud.

Defendants argue that the SI fails to allege that defendants engaged in material misrepresentations or omissions in selling their converter/descramblers. The government, on the other hand, argues that the SI sufficiently alleges all the elements of mail and wire fraud.[2] The elements of mail and wire fraud are: (1) a scheme to defraud; (2) to get money or property; (3) furthered by using interstate mail or wires. *Neder v. United States*, 527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *United States v. Autuori*, 212 F.3d 105, 115 (2nd Cir.2000).

Although the mail and wire fraud statutes do not define "scheme to defraud," case law demonstrates that the government is required to prove the existence of a scheme to defraud, fraudulent intent on the part of the defendants, and material misrepresentations or omissions made in furtherance of the scheme. *Autuori*, 212 F.3d at 115. However, at the present

---

1. The Court notes that the defendants filed motions and amended motions for bill of particulars in this case (Filing Nos. 70, 79, 92, 128, 136, 142, 148, and 149). Those motions were granted in part and denied in part by the magistrate judge at a hearing on February 23, 2000 (Filing No. 172). However, when examining the sufficiency of an indictment, the Court does not take into account information contained in a bill of particulars as that document cannot save the substantive deficiencies in an indictment. *United States v. Helmel*, 769 F.2d 1306, 1322 (8th Cir.1985).

2. It is important to note that the mail and wire fraud charges do not depend on the violation of another statute. *United States v. Manzer*, 69 F.3d 222, 226 (8th Cir.1995).

posture of the case, the government must only allege the elements of the crime and state a factual basis giving rise to the charges. The government sufficiently alleges these factors in the SI.

The government alleges the scheme to defraud involved providing customers with the capability of receiving premium cable channels free of cost, thus prohibiting cable providers from collecting fees for those services. (SI at ¶¶ 1, 2; Count 1 generally). These sales generated significant profits for the defendants. Under the other paragraphs of Count 1, the government alleges specific actions taken by the defendants in furtherance of the scheme to defraud.

■ The government also meets the requirement that it sufficiently alleged intent by ¶ 18, wherein the government alleges that the defendants "knowingly" conspired. See e.g. United States v. Rogers, 652 F.2d 972, 975 (10th Cir.1981) (holding that the government's allegation that defendants "knowingly" acted met the intent requirement) and United States v. Schneiderman, 102 F.Supp. 87, 93 (S.D.Cal.1951) (holding that intent may be averred generally using "knowingly" or "willingly").

The final factor in "scheme to defraud" is the subject of the defendants' motions— material misrepresentations or omissions. On June 10, 1999, the United States Supreme Court decided Neder, wherein the Court held that materiality of the misrepresentation or omission is an element of the federal mail and wire fraud statutes. Neder, 527 U.S. at 25, 119 S.Ct. 1827. The Supreme Court stated that a false statement is material if it has " 'a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed.' " Id. at 15, 119 S.Ct. 1827 (citations omitted). The Court noted that federal fraud statutes do not incorporate all the elements of common law fraud, such as reliance and damages, and that such an inclusion would clearly be inconsistent with the statutes Congress enacted. Id. at 24–25, 119 S.Ct. 1827.

Turning to the specific arguments of the parties, the Court finds that the government has sufficiently alleged material misrepresentations to withstand a motion to dismiss at this stage. The government's objection to the magistrate judge's report and recommendation alleges that (1) defendants can essentially be liable for the material falsehoods made by the end consumers to the cable providers, (2) defendants did make material misrepresentations and concealments to cable providers and manufacturers, and (3) the Cable Act creates an affirmative duty for those selling converters/descramblers to inform cable providers in the local area that they are doing so, and failure to do so is a material omission.

■ The government first argues that defendants can be liable for material falsehoods communicated by the end consumers. In Neder, the Court states that by prohibiting the "scheme to defraud," rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted. The underlying inference in that language is that the representations must be made by the defendant. In a recent decision from the United States Court of Appeals for the Seventh Circuit, United States v. Gee, the court foreclosed the argument that one could be convicted of mail or wire fraud based upon the misrepresentations of end users. United States v. Gee, 226 F.3d 885, 892 (7th Cir.2000). Thus, the allegations of comments by end consumers in this case are insufficient to form a basis for the mail or wire fraud charges.

■ The government next argues that material misrepresentations do not need to be made directly to the victim of the

scheme to defraud—cable service providers—rather the misrepresentations or omissions must merely be made in furtherance of the scheme to defraud. The Court agrees. In *United States v. Blumeyer,* the United States Court of Appeals for the Eighth Circuit recognized that the question of whether one can be convicted of mail or wire fraud for representations not made directly to the victims of the fraud is difficult and not easily answered by case law. *United States v. Blumeyer,* 114 F.3d 758, 767 (8th Cir.1997). Ultimately, the Eighth Circuit determined that one can be convicted of mail or wire fraud even if misrepresentations are not made to the victim. *Blumeyer,* 114 F.3d at 768. The defendants argue that *Blumeyer* is no longer applicable because it was decided prior to *Neder.* However, *Neder* did not change the elements of mail and wire fraud, but merely held that the misrepresentations made in furtherance of a scheme to defraud must be material. *Neder,* 527 U.S. at 25, 119 S.Ct. 1827. In fact, the Supreme Court's definition of "material" which involves communications influencing a "decisionmaking body" suggest that the misrepresentations do not need to be made directly to the victim.

■ Although the government cannot meet its burden of proof by establishing that the persons to whom the defendant sold these converter/descramblers made material misrepresentations to the cable service providers, the government has sufficiently alleged that the defendants made misrepresentations to the manufacturers of the converter/descramblers in furtherance of the scheme to defraud (*see, e.g.,* SI at ¶ 36). The Court further notes that the ultimate determination of materiality, as an essential element of the offense, is a question for the jury. *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

■ Finally, the government argues that the Cable Act creates an affirmative duty on the part of defendants to inform cable service providers in the area that they are selling converter/descramblers. Thus, the government argues, the failure of defendants to inform cable service providers that they were selling in the local area is a material omission which satisfies the element of material misrepresentation articulated in *Neder* and extended in *Autuori.*

The Cable Act states, in pertinent part, "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, **unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.**" 47 U.S.C. § 553(a)(1) (emphasis added). It is this language that the government suggests supports a finding that the statute imposes an affirmative duty. This language, however, does not clearly impose an affirmative duty to disclose. Therefore, the Court examines the legislative history to determine if Congress intended such a duty to exist.

The legislative history presents a different picture. In general, the House Report on the issue states that the Committee was concerned with the theft of cable services. H.R. No. 98–934, at 84, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4721. The report further states that the Committee does not intend a seller's legal conduct to become illegal because of the actions of others, of which the seller has no knowledge or intention to insist. The report, on a whole, suggests that the statute does not impose a legal duty to disclose, but rather punishes those who, with the requisite intent, assist in the theft of services. The statute, by its terms and the legislative intent of Congress, does not impose an affirmative duty to disclose. Thus, the Court finds

that the failure of defendants to inform cable service providers that defendants were selling converter/descramblers in the area does not provide a basis to find that defendants made material misrepresentations in furtherance of the scheme to defraud.

The other elements of mail and wire fraud are not challenged by the defendants and are sufficiently alleged in the SI. Counts 2–16 sufficiently set forth the use of the United States Postal Service to send remittance checks for the sale of the converter/descramblers. Counts 17–28 sufficiently set forth the use of wire communications to complete fax transmissions and phone calls in furtherance of the scheme.

### B. Money Laundering.

■ The defendants also argue that the money laundering charges should be dismissed. This argument is sustainable only if the Court were to grant defendants' motions to dismiss the mail and wire fraud counts. Having found that defendants' motions to dismiss the mail and wire fraud counts should be denied, the Court also finds that the defendants' motions to dismiss the money laundering counts should be denied as the mail and wire fraud counts are sufficient to support the money laundering counts. *See* 18 U.S.C. §§ 1956 and 1957 (listing mail and wire fraud as "specified unlawful" activities).

Defendant Joseph Abboud's objection (Filing No. 247) seeks dismissal of three domestic money laundering counts, Counts 47, 48 and 49. The magistrate judge's report and recommendation does not directly address why those three counts were not recommended for dismissal, along with the other money laundering counts. Their disposition, however, is subject to the same rationale as are the other money laundering counts, and this objection of Joseph Abboud will be denied.

For the reasons set forth in this memorandum and order, the Court finds the magistrate judge's report and recommendation should be rejected, and the defendants' motions to dismiss will be denied.

IT IS ORDERED:

1) The report and recommendation of the magistrate judge (Filing No. 241) is rejected.

2) The motions of defendants Susan Germer, Infinite Electronics, and Gene Abboud to join in the motions to dismiss (Filing Nos. 250 and 254) are granted.

3) Defendants' motions to dismiss (Filing Nos. 141, 145, 150) are denied.

4) United States' objection to the magistrate judge's report and recommendation (Filing No. 257) is granted in part and denied in part.

5) Defendant Joseph Abboud's objection to the magistrate judge's report and recommendation (Filing No. 247) is denied.

### REPORT AND RECOMMENDATION

JAUDZEMIS, United States Magistrate Judge.

This matter is before the court on motions filed by defendants David Abboud, Baron Abboud, and Joseph Abboud (together, "Movants") to dismiss certain counts of the superseding indictment in light of the U.S. Supreme Court's ruling in *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (filings # 141, # 145 and # 150). The charges at issue in this motion are:

● Count 1/Conspiracy to commit wire fraud and mail fraud (paragraphs 18(a) & (b) of the superseding indictment) as to all defendants.

● Counts 2–16 (mail fraud) as to David and Joseph Abboud, itemizing letters containing remittance checks representing proceeds of the sale of con-

verter/descramblers sent from United Parcel Service in New Jersey and delivered by the U.S. Postal Service to M.D. Electronics or United Imports.

- Counts 17–28 (wire fraud) as to David and Joseph Abboud, itemizing fax transmissions from Omaha to Grand Cayman, a telephone call from Omaha to Grand Cayman, and a bank wire transfer from Omaha to Florida.

- Count 36 (conspiracy to commit money laundering) as to all three movants;

- Counts 37–46 (money laundering) as to David and Joseph Abboud;

- Counts 47–49 (money laundering) as to Joseph Abboud;

- Counts 50–53 (money laundering) as to David Abboud; and

- Counts 54–62 (money laundering) as to David and Joseph Abboud.

A hearing was held on April 4, 2000. Joseph Abboud has been given leave to adopt the reply brief filed by codefendant David Abboud. The final post-hearing brief was received on April 28, 2000, at which time the motions were deemed submitted. For the reasons explained below, I shall recommend that the motions to dismiss be granted.

### FACTUAL ALLEGATIONS

#### A. How the Cable Television Industry Works

The superseding indictment provides the following description of the cable television industry in the United States.

Cable television companies are licensed by the Federal Communications Commission ("FCC") and operate under franchises granted by local governments. Cable service involves the simultaneous receipt and forwarding of broadcast television and satellite signals. The signals are received at the cable system control center, known as the "headend," and are processed and re-transmitted over coaxial cable via closed circuit radio frequency transmissions.

The programming transmitted by cable television companies—e.g., basic service, premium channels such as HBO, and pay-per-view—is intended to be received only by paying subscribers. Basic cable service subscribers must pay additional subscription fees to receive premium programming and must pay on a per-event basis for pay-per-view service. Each cable television subscriber is entitled to receive only that level of programming services that he or she selects and purchases.

Accordingly, the cable companies encrypt their signals to prevent the "piracy" of premium and pay-per-view programming. Scrambling is the primary security method employed by cable television operators to prevent subscribers from receiving programming services for which they have not paid.

A number of manufacturers sell integrated cable television security systems and channel access equipment to cable television operators. These devices are called "converter/descramblers." The encoding and decoding technologies used by the various manufacturers are unique.

Cable television companies can provide subscribers access to premium and pay-per-view programming with converter/descramblers which can descramble the encrypted signals. The converter/descramblers must be compatible with the particular security technology used by the cable operator and have an addressability feature by which the cable operator authorizes a subscriber's converter/descrambler to receive only the programming and services purchased by the subscriber.

Converter/descramblers may be modified by replacing an integrated circuit or "chip," or by installing a device known as a "module." A converter/descrambler modi-

fied with a certain type of chip or module descambles all premium programming channels and pay-per-view services, thus defeating the addressability function of the converter/descrambler. These devices are "non-addressable" because a cable operator cannot electronically monitor the level of service provided to a subscriber. In other words, cable companies cannot communicate with or detect the use of modified converter/descramblers.

Subscribers who obtain converter/descramblers from sources other than their cable company can access premium and pay-per-view programming on a continuous basis without paying the cable company the additional fees. Basic cable television service subscribers who use such modified converter/descramblers receive all premium and pay-per-view programming without detection and without payment of the required subscription fee to the cable company.

## B. Factual Allegations

### 1. Conspiracy to Commit Wire Fraud, Mail Fraud, and Unauthorized Reception of Cable Television Service (the "Count I conspiracy")

Defendants/movants are engaged in the business of manufacturing, assembling, modifying, importing, selling and distributing electronic equipment, including cable television converter/descramblers, through codefendant company United Imports Corp. ("United Imports"). David Abboud and Joseph Abboud are shareholders of United Imports. David Abboud, a director of United Imports, was involved in the ordering and purchasing of cable television converter/descramblers from Far East manufacturers through a business in the Cayman Islands.

Joseph Abboud acted as President, Secretary, Treasurer, and a director of United Imports. He handled the day-to-day operations of the business. Joseph Abboud allegedly designed specifications for and made large purchases of converter/descramblers from Far East manufacturers through a business in the Cayman Islands.

Movant Baron Abboud acted as general manager of United Imports. He also operated a business called Script Cable and Wireless ("SCW"). SCW was a fictitious company that posed as a cable operation ostensibly doing business in Florida and Grand Cayman Island. Baron Abboud oversaw the investments of David and Joseph Abboud through Legend Capital Management Company.

Baron Abboud and Joseph Abboud used the aliases Clayton Masters and Charles Barkley, respectively, to conceal their true identities from cable service providers and the manufacturers of after-market converter/descramblers. They also misrepresented themselves as employees of a cable service provider, i.e., SCW, in order to purchase the after-market converter/descramblers.

### The Products

United Imports, through David Abboud and Joseph Abboud, purchased both new and used converter/descramblers. Many of the devices were originally produced by authorized cable manufacturers. Some of the converter/descramblers purchased by United Imports had already been modified by others to receive premium cable television programming for free.

Sometimes, United Imports' employees, at the direction of Joseph Abboud, would modify the converter/descramblers by various means, including installing chips, boards and modules which would allow users to receive full premium and pay-per-view television programming for free. As part of the modification process, United Imports' employees, at the direction of Joseph Abboud, would remove identifying serial numbers from the converter/descramblers so that the source of the modified converter/descramblers was concealed

from cable service providers and law enforcement agencies.

United Imports and Joseph Abboud also entered into arrangements to purchase converter/descramblers from Far East companies such as Goodmind Industries, Samsung and SK Electronics. These companies, pursuant to specifications provided by Joseph Abboud, manufactured large numbers of devices for purchase by United Imports. The devices were later sold by United Imports as non-addressable converter/descramblers.

United Imports, Joseph Abboud, David Abboud, and Baron Abboud also purchased, from various supply sources for later sale, certain non-addressable descramblers commonly known as "pancakes" or "black boxes." United Imports purchased a large quantity of "pancakes" and after-market converter/descramblers from codefendants Broadway Enterprises and Gene Abboud. United Imports subsequently sold these devices, which were capable of allowing the unauthorized receipt of premium and pay-per-view cable television programming. United Imports sold similar devices to Broadway Enterprises and Gene Abboud for sale to customers.

The converter/descramblers sold by United Imports, David Abboud and Joseph Abboud were non-addressable so that cable service providers were unable to monitor the programming received by purchasers of these converter/descramblers. United Imports, David Abboud and Joseph Abboud concealed the sale and use of the non-addressable descramblers by not informing cable service providers that these devices had been sold to customers in the cable service provider's area.

United Imports and Joseph Abboud also advertised and sold an electronic device called a "bullet buster," the purpose of which was to prevent cable television operators to electronically shut down those who were stealing premium and pay-per-view programming.

### *Marketing*

United Imports, David Abboud and Joseph Abboud marketed their products nationally through magazine advertising in such publications as Popular Science and Popular Mechanics. These advertisements included a 1–800 telephone number for customers to call to make purchases from defendant United Imports. Joseph Abboud provided "legal scripts" to United Imports' inbound telephone operators. Using the "legal scripts," United Imports' inbound telephone operators misrepresented that pay-per-view access was strictly between the purchaser and their cable company. In fact, the non-addressable converter/descramblers sold by United Imports were already capable of receiving pay-per-view without notification to the cable service provider. While the inbound operators were instructed not to expressly guarantee the receipt of pay-per-view programming, they did extend a 30–day money back guarantee.

United Imports, David Abboud, and Joseph Abboud also mailed disclaimers to purchasers to conceal the true nature of the converter/descramblers from cable service providers and law enforcement agencies. The disclaimers allegedly misrepresented that cable service providers would allow purchasers of defendants' non-addressable converter/descramblers to use them in the providers' areas and that the non-addressable converter/ descramblers capable of receiving all premium and pay-per-view programming could be used legally.

United Imports ceased operations in August 1997. However, in May 1997, Joseph Abboud entered into an agreement with Omaha Electronics, an electrical company previously uninvolved in the cable television business. Pursuant to the agreement,

business entities controlled by David Abboud and Joseph Abboud sold to Omaha Electronics the necessary components for converter/descramblers. Joseph Abboud determined the price Omaha Electronics paid for the components as well as the price Omaha Electronics could charge for the resale of the same components. Joseph Abboud gave Omaha Electronics a list of customers who would buy the components, including codefendants Infinite Electronics and Broadway Enterprises. Joseph Abboud also supplied Infinite Electronics with encoders, computers, and programmers.

Infinite Electronics, which began operating in Summer 1997, was managed by codefendant Susan Germer. Infinite Electronics used the components and equipment obtained from Omaha Electronics and Joseph Abboud to produce non-addressable converter/descramblers capable of allowing the unauthorized receipt of premium and pay-per-view programming. The non-addressable devices were sold by Susan Germer and Infinite Electronics to, among others, Gene Abboud and Broadway Enterprises. Any defective converter/descramblers were returned to Omaha Electronics, which would then transport the returned devices to business entities controlled by Joseph Abboud.

### Overt Acts in Furtherance of the Count 1 Conspiracy

In summary, the superseding indictment alleges 34 overt acts committed between 1989 and 1998 in furtherance of the Count 1 conspiracy. These acts include:

- David and Joseph Abboud traveling from Nebraska to Grand Cayman Island on several occasions to purchase Script Corporation; to meet with John Mathewson at Guardian Bank to discuss purchases from and payments to suppliers; the operation of Script Cable and Wireless; Joseph Abboud's use of the Charles Barkley alias; courier service to be used from Nebraska to Grand Cayman Island.

- Numerous telephone calls or fax transmissions made by David and Joseph Abboud to John Mathewson at Guardian Bank on Grand Cayman Island instructing him to purchase or pay various manufacturers for converter/descramblers; directing Mathewson to send documents to Robert Branlinger of Cable Services, Inc., in Williamsport, Pennsylvania.

- On August 16, 1992, Joseph Abboud caused a letter signed by Charles Barkley to be faxed from Script Cable and Wireless to Cable Services, Inc., in Williamsport, Pennsylvania.

- Telephone calls or wire communications by Joseph Abboud to Script Corporation to purchase converter/descramblers.

- Meeting between Joseph Abboud and representatives of Omaha Electrics to set up a distributorship for the components of converter/descramblers.

- Purchases of a total of 700 converter/descramblers by Joseph Abboud from Leasing Ventures in Hollywood, Florida.

- United Imports' purchase from Gene Abboud of a total of 140 converter/descramblers.

- On September 13, 1993, Todd Littlejohn d/b/a Freedom Electronics purchased converter/descramblers from Everquest, the wholesale arm of defendant United Imports.

- Purchase of 1–800 telephone numbers and customer lists by Joseph Abboud from William Yeh d/b/a U.S. Cable and Todd Littlejohn d/b/a Freedom Electronics.

- Placement of magazine advertisements by Joseph Abboud and David Abboud.

- On November 12, 1992, Baron Abboud opened a bank account in the name of Script Cable and Wireless at Barnett Bank in Fort Lauderdale, Florida.
- Establishment of checking accounts by codefendants Gene Abboud, David Abboud and Susan Germer.
- In 1992, Baron Abboud traveled to Florida and purchased 2,500 "after market" converter/descramblers from a cable pirate.
- Sales of converter/descramblers by United Imports to six individual customers.
- Facsimile transmission by Joseph Abboud to Omaha electrics a list of companies that would purchase the components of converter/descramblers from Omaha Electrics.
- Susan Germer instructed and demonstrated to a person known to the grand jury how to modify a converter/descrambler to receive unauthorized premium and pay-per-view television programming.

### 2. The Money Laundering Conspiracy (Count 36)

The superseding indictment further alleges that the defendants/movants conspired to commit money laundering offenses in conjunction with the business activities described above. *See* 18 U.S.C. §§ 1956(a) & 1957. One object of the conspiracy was to promote defendants' cable piracy operation by using funds generated by sales in the United States to purchase additional converter/descramblers through an over invoicing scheme using bank accounts in the United States and in the Cayman Islands. A second object was to conceal the source and ownership of the proceeds of defendants' cable piracy operation by transferring the proceeds from the United States through Cayman Islands "shelf" corporations and returning the proceeds to the United States to invest in brokerage accounts and real estate.

Between April 1989 and January 1995, the movants traveled to Grand Cayman Island to open accounts at Guardian Bank. The accounts were in the names of various Cayman Islands "shelf" corporations including Script, ANX and Ackroid. Movants used the Script corporation and funded the Script account at Guardian Bank as follows.

Movants directed John Mathewson, President of Guardian Bank, to place orders on behalf of Script Corporation for converter/descramblers with Far East manufacturers, including Samsung, Goodmind Industries and SK Electronics. The converter/descramblers were usually drop shipped to Omaha, Nebraska. Guardian Bank received invoices from the Far East Manufacturers reflecting the amount of money owed for the converter/descramblers. Upon receipt of the invoices, Script Corporation would re-invoice defendant United Imports at an inflated price. The Script Corporation invoices to defendant United Imports listed the purchase price at 10% to 30% over the actual cost of the converter/ descramblers. United Imports and the movants paid the inflated Script invoices with monies generated from the sale of non-addressable converter/descramblers which were on deposit at United Imports' bank accounts in Omaha, Nebraska. These monies were transferred from Omaha to the Script Corporation at Guardian Bank, Grand Cayman, by check sent via courier or by wire transfer. John Mathewson, at movants' instruction, paid the Far East manufacturers with the monies received from United Imports' bank accounts in Omaha, Nebraska. The over-invoiced amounts paid by United Imports were credited to the Script Corporation account at Guardian Bank.

David and Joseph Abboud also transferred the over-invoiced proceeds from the Guardian Bank Script account to their Guardian Bank ANX account. On December 7, 1993, David and Joseph Abboud caused $1 million to be transferred from the Guardian Bank ANX account to Prudential Bache Securities, establishing an investment brokerage account in the name ANX Corporation. Baron Abboud, through his Nebraska corporation, Legend Capital Management, was designated by David and Joseph Abboud as the authorized trader for the Prudential Bache ANX account.

David Abboud transferred over-invoiced proceeds from the Guardian Bank Script account to his Guardian Bank Ackroid account. Proceeds from the Ackroid account were used to establish an investment brokerage account, in the name Ackroid Corporation, with Prudential Bache Securities. Through a series of transactions, this account was transferred to Charles Schwab. As of August 1998, the Schwab investment brokerage account, also in the name Ackroid Corporation grew to a value of $4.7 million. Baron Abboud, through Legend Capital Management, was designated the authorized trader for this account. Between August and September 1998, the account was liquidated and the proceeds returned to the Cayman Islands.

In July 1994, Joseph Abboud transferred $490,484 derived from the sale of converter/descramblers from Script Corporation's Guardian Bank Account to the United States. This money was used to purchase real estate, namely 1222 South 184th Circle, Omaha, Nebraska.

Finally, David and Joseph Abboud used proceeds from cable piracy sales to acquire and maintain assets including investment brokerage accounts and real estate titled in the names of others for the purpose of concealing the ownership and control of those assets. Counts 37 through 62 (money laundering) identify corresponding domestic and international transactions involving checks and wire transfers totaling $27 million.

## SUMMARY OF ARGUMENTS

### Defendants

The underlying crime alleged in the superseding indictment is the Count 1 conspiracy to violate 47 U.S.C. § 553(a)(1), i.e., to "intercept, receive and assist in intercepting and receiving certain communication services offered over a cable system, which was not specifically authorized by a cable operator and otherwise not specifically authorized by law for the purpose of commercial advantage and private financial gain." SSI ¶ 18(c).

The elements of mail or wire fraud are (1) a scheme to defraud (2) to get money or property, (3) furthered by the use of interstate mail or wires. As to the first element, the government must prove (a) the existence of a scheme to defraud (b) fraudulent intent on the part of the defendant, and (c) the materiality of the misrepresentations. *See Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In this case the "scheme to defraud" is identified in the superseding indictment as the Count 1 conspiracy.

The money laundering statutes, 18 U.S.C. §§ 1956(a) & 1957, also require proof of the defendants' "intent to promote the carrying on of specified unlawful activity," or knowledge that the money in question was derived from "specified unlawful activity." That unlawful activity is identified in the superseding indictment as the Count 1 conspiracy; however, a § 553 violation cannot serve as the underlying charge in a money laundering count because it has not been included as a "specified unlawful activity" by Congress. *See* 18 U.S.C. § 1956(c)(7) (definitions).

In *Neder v. United States*, the Court held that materiality of falsehood is an element of the federal mail fraud and wire fraud statutes. A statement or omission is material "if it has 'a natural tendency to influence or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *Id.* at 16, 119 S.Ct. at 1837. Defendants all argue that the superseding indictment fails to allege mail fraud, wire fraud or money laundering because it does not allege that the defendants employed any material falsehoods in selling the converter/descramblers to their customers. The superseding indictment does not identify either the purchasers of the converter/descramblers or the sellers of the after market descramblers as being the victim of an alleged scheme to defraud. Misrepresentations made to persons or entities other than the cable companies cannot be material to the object of this conspiracy as a matter of law.

### United States

The defendants are charged with selling non-addressable cable television converter/descramblers for the purpose of assisting the purchasers in the unlawful reception of cable television programming, thereby defrauding the cable television service providers of subscription revenues. This activity constitutes a scheme and arti-fice to defraud the cable companies of money. Defendants used the mail and wires to execute this scheme. The primary object of the conspiracy to commit violations of 47 U.S.C. § 553, 18 U.S.C. § 1341[1] and 18 U.S.C. § 1343[2] was to enrich the defendants through fraud by selling converter/descramblers that were designed to assist in the unauthorized interception and receipt of cable television programming.

Citing *United States v. Manzer*, 69 F.3d 222 (8th Cir.1995), the government argues that the mail fraud and wire fraud charges are substantive offenses that do not depend on the violation of another statute. Under *Neder*, materiality of falsehood is an element of a scheme or artifice to defraud under the federal mail and wire fraud statutes. The mail and wire fraud statutes do not define the term "scheme or artifice to defraud" or mention "materiality." In *Neder*, the Court acknowledged the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses. When the mail and wire fraud statutes were enacted, common law fraud required proof of a misrepresentation or concealment of material fact. Since *Neder* was a fraudulent loan case involving a common form of misrepresentation or concealment of material fact, the Court had no need to expand its dis-

1. The mail fraud statute, 18 U.S.C § 1341, provides:

   Whoever, having devised or intending to devise any scheme or artifice to defraud ..., places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both....

2. The wire fraud statute, 18 U.S.C. § 1343, provides:

   Whoever, having devised or intending to devise any scheme or artifice to defraud.... transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both....

cussion of common law fraud to include "cheater devices." Going beyond the discussion required by the factual situation in *Neder*, the common law of fraud does include the type of conduct charged in the superseding indictment.

The government contends that paragraphs 23, 24, 27, 28, 30, 31, 32, 33, 36 and 40 of the superseding indictment allege misrepresentations or concealments of material fact sufficient to satisfy *Neder*. Govt.'s Brief at p.7, n. 9; Govt.'s Post–Hearing Brief at p.3.

The removal of serial numbers concealed the original source of the devices, a material fact, in furtherance of the scheme to defraud cable service providers. Defendants procured the devices from "unsuspecting manufacturers" by using aliases and by purchasing the devices from other cable pirates. By removing the serial numbers, defendants created a falsehood, i.e., that the box was generic or from an unknown source, which was material because cable companies and law enforcement would attach importance to the true origin of the box in determining how to act when faced with untraceable boxes. The government does not contend that defendants had an affirmative duty to ensure that cable service providers could trace the origin of converter/descramblers. Rather, defendants removed the serial numbers to prevent their being sued by cable service providers in the event the providers were somehow able to identify the modified product as their own. Removal of the serial numbers would also make criminal prosecution more difficult. The source of the converter/descrambler is a material fact that cable service providers and law enforcement would regard as important in determining their choice of action.

Similarly, defendants made their converter/descramblers non-addressable to conceal the following material facts in furtherance of the scheme to defraud the affected cable service providers:

- that the devices were being used in particular cable service areas; and

- the level of programming actually being received by defendants' customers.

The defendants knew the identity of the specific cable service providers for the areas where the converter/descramblers were to be used and were able to program the devices to descramble each particular cable provider's signal. Despite knowing the identity of the provider affected by each sale, defendants did not notify the cable service providers that they sold a product in the service area that could be used to steal cable service. While defendants' failure to notify is not a violation of a per se affirmative duty, it constituted a concealment of a material fact in furtherance of the scheme to defraud the cable service providers.

The use of "legal scripts" and disclaimers by inbound telephone operators also concealed a material fact: that defendants' products were theft devices.

The use of aliases by Baron and Joseph Abboud constitutes a material misstatement because they knew legitimate cable service providers would not sell their aftermarket converter/descramblers to people who would modify the devices to steal cable.

If these factual allegations warrant an inference that a statement or representation alleged to be false is material, or, in other words, that it is capable of being proved material at trial, then the indictment is sufficient. *See United States v. McGough*, 510 F.2d 598, 602 (5th Cir.1975). The significance of defendants' concealments and misstatements should ultimately be determined by a jury.

## LEGAL ANALYSIS

In *Neder v. United States*, the defendant was convicted of, *inter alia*, wire fraud, mail fraud, and bank fraud in conjunction with schemes to obtain financing for land development projects. In one scheme, Neder purchased 12 parcels of land using shell corporations and immediately resold the land at much higher prices to limited partnerships controlled by him. He secured bank loans using inflated appraisals and concealed from the lenders that he controlled the shell corporations, had purchased the land at prices substantially lower than the inflated resale prices, and that the limited partnerships had not made substantial down payments as represented. In a second scheme, Neder obtained a two construction loans by falsely representing to the lender that he satisfied a condition of the loan by making advanced sales of 20 condominium units. A third scheme involved Neder's obtaining a consolidated $14 million land acquisition and development loan. Pursuant to the loan agreement, Neder could request funds for work actually performed on the project. He submitted numerous requests based on false invoices and obtained almost $3 million unrelated to any work actually performed.

The trial court did not instruct the jury on "materiality" as an element of any of the offenses charged. Much of the Court's opinion is harmless-error analysis regarding the trial court's failure to instruct the jury on the element of materiality on two counts of filing false income tax returns. Regarding Neder's fraud convictions, the U.S. Supreme Court considered the question of "whether materiality is an element of the federal mail fraud, wire fraud, and bank fraud statutes." 527 U.S. at 7, 119 S.Ct. at 1833.

In determining that the trial court's error in failing to instruct the jury on the element of materiality on the false income tax return charges was harmless, the Court reasoned,

> To obtain a conviction on the tax offense at issue, the Government must prove that the defendant filed a tax return "which he does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). **In general, a false statement is material if it has "a natural tendency to influence", or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed**.... In a prosecution under § 7206(1), several courts have determined that "any failure to report income is material." .... Under either of these formulations, no jury could reasonably find that Neder's failure to report substantial amounts of income on his tax returns was not "a material matter."

527 U.S. at 16, 119 S.Ct. at 1837.

Turning to the fraud counts, the Court observed that the mail fraud and wire fraud statutes both prohibit " 'any scheme or artifice to defraud' or to obtain money or property 'by means of false or fraudulent pretenses, representations, or promises.' " *Id.* at 20, 119 S.Ct. at 1839. The Court noted that "none of the fraud statutes defines the phrase 'scheme or artifice to defraud,' or even mentions materiality." *Id.*, 119 S.Ct. at 1839. Based on a natural reading of the text, materiality would not appear to be an element of the fraud statutes. *See id.*, 119 S.Ct. at 1839.

However, when Congress uses terms that have accumulated settled meaning under the common law, "a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Id.* at 21, 119 S.Ct. at 1840. The Court agreed with Neder that Congress implicitly incorporated the common-law meaning of the term "defraud," including its requirement of ma-

teriality, into the mail and wire fraud statutes. At this point, the Court apparently adopted the following definition of materiality:

The Restatement instructs that a matter is material if:

"(a) a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or

"(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."

Restatement (Second) of Torts § 538 (1976).

*Neder*, 527 U.S. at 22 n. 5, 119 S.Ct. at 1840 n. 5 (quoting Restatement (Second) of Torts § 538 (1976)). The Court held that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Id.* at 25, 119 S.Ct. at 1841.

Very recently, in *United States v. Autuori*, 212 F.3d 105 (2nd Cir.2000), the Second Circuit applied the *Neder* decision in a wire and mail fraud case where the alleged material misrepresentations involved omissions as well as affirmative statements. The indictment alleged that Autuori, an accountant, participated in a scheme to defraud by materially misrepresenting in several ways the financial condition of a real estate venture promoted by Colonial Realty Company. Autuori was convicted of 10 counts of mail fraud and six counts of wire fraud in conjunction with this scheme. The trial judge, however, granted his motion for judgment of acquittal and granted conditionally Autuori's motion for new trial. On appeal by the government, the Second Circuit affirmed the judgment of acquittal on some counts but

remanded the cause for a new trial on the remaining counts.

The Court of Appeals first described the elements of mail or wire fraud as (1) a scheme to defraud, (2) to get money or property, (3) furthered by the use of interstate mail or wires. The first element must be established by proof of (a) the existence of a scheme to defraud, (b) the fraudulent intent on the part of the defendant, and (c) the materiality of the misrepresentations. *United States v. Autuori*, 212 F.3d 105, 115. Because the second and third elements were not contested by Autuori, the court's discussion focused on the first element.

On the issue of materiality, the court summarized:

"[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994). The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose. *See United States v. Altman*, 48 F.3d 96, 102 (2d Cir.1995). "[U]nder the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *United States v. Townley*, 665 F.2d 579, 585 (5th Cir.1982).

*Id.* at 118. The Court of Appeals found that Autuori made several affirmative representations to potential investors that a reasonable juror could find materially misleading.

Material falsehood may also be accomplished by omission. An omission can violate the fraud statute only in the context of a duty to disclose. The duty to disclose may arise in a fiduciary situation, or "where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading." *Id.* at 118–19. Omissions may be considered fraudulent in another sense: a jury could conclude that because the accused did not disclose his full knowledge of the matter in question, his affirmative representations were misleading by their incompleteness. *See id.*

> "To be sufficient, an indictment must allege every element of the crime charged." . . . . "An indictment's failure to charge an offense is a jurisdictional defect." . . . Because the sufficiency of an indictment is a prerequisite to jurisdiction, a "defendant[ ] at any time may raise an objection based on failure to charge an offense." . . .

> In determining the sufficiency of the indictment, "[t]he law does not compel a ritual of words." . . . . "The test of the validity of an indictment is 'not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards.'" . . . .

*United States v. Richards,* 204 F.3d 177, 191 (5th Cir.2000).

Focusing on the language of the superseding indictment, the court finds that the government has identified the Count 1 conspiracy (to commit wire fraud, bank fraud, and violations of 47 U.S.C. § 553) as the "scheme or artifice to defraud" providing the basis for the individual counts of mail and wire fraud. Accordingly, the government must prove that (a) there was a scheme to defraud cable television service providers, (b) that the defendants had the requisite intent to defraud the cable television service providers, and (c) the

defendants made materially false statements or omissions.

To whom must the "materiality of falsehood" be addressed? The facts of *Neder, Autuori,* and even *United States v. Manzer,* 69 F.3d 222 (8th Cir.1995), suggest that the culpable misrepresentations (either by affirmative statement or by omission) must be directed toward the person or entity defrauded. In this case, the superseding indictment explains at length how and why the cable television service providers encrypt or scramble their signals to prevent the "piracy" of premium and pay-per-view programming. Basically, the defendants are alleged to have procured, manufactured and/or modified unidentifiable and nonaddressable converter/descramblers for sale to individuals who may choose to use the devices to intercept premium television programming without paying their cable television provider for that privilege. The indictment does not allege that the defendants made any affirmative statements to the victims of the alleged scheme, i.e., the cable television service providers. Rather, the defendants made every effort to avoid contact with the cable companies.

Was materiality of falsehood achieved by omission? The government argues that the removal of serial numbers concealed the original source of the devices, a material fact, in furtherance of the scheme to defraud cable service providers. The non-addressability feature of the converter/descramblers allowed persons using the devices to conceal the fact that they were being used in particular cable service areas and the level of programming actually being received by defendants' customers.

The government can cite no affirmative legal authority specifically requiring the defendants to notify cable service providers that they were selling non-addressable converter/descramblers bearing no se-

rial numbers in certain service areas. The court does not wish to trivialize the defendants' moral culpability in designing and selling this particular product; however the ultimate use of the converter/descramblers was determined by the purchasers of the devices, not by the defendants. Under the facts alleged in the indictment, someone could purchase a modified converter/descrambler from United Imports and either not use it or tell their cable service provider that they had the device and to bill them accordingly. The defendants could still have a business plan and could make money from selling the box fully believing that the consumer would engage in cable piracy, but no material misstatement or omission would have been made to the cable service provider. Conversely, if the purchaser did decide to use the unidentifiable, non-addressable converter/descrambler to watch "free" premium cable television programming, the purchaser, not the defendants, would be the one making any fraudulent statement or omission to the cable service provider.

For these reasons, I shall recommend that Count 1 paragraphs 18(a) and 18(b) (conspiracy to commit mail fraud and wire fraud), Counts 2 through 16 (mail fraud), and Counts 17 through 28 (wire fraud) be dismissed as to defendants/Movants David Abboud, Joseph Abboud, and Baron Abboud.

Turning to the charges of domestic and international money laundering and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956 and 1957, the statutes provide, in part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-

> (A)(i) with the intent to promote the carrying on of specified unlawful activity; . . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

\*   \*   \*   \*   \*   \*

> (2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States-

> (A) with the intent to promote the carrying on of specified unlawful activity; . . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both. . . .

\*   \*   \*   \*   \*   \*

> (h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956.

Under § 1956(c)(1),

> the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, re-

gardless of whether or not such activity is specified in paragraph (7)

Paragraph (7) of § 1956(c) consists of a long list of "specified unlawful activities." That list does not include mail fraud, wire fraud, or violations of 18 U.S.C. § 553.

18 U.S.C. § 1957 describes a similar offense involving criminally derived property of a value greater than $10,000 derived from "specified unlawful activity" under circumstances where (a) the offense takes place in the United States or in the special maritime and territorial jurisdiction of the United States or (b) the offense is committed by a "United States person." "Criminally derived property" means any property constituting or derived from proceeds obtained from a criminal offense. § 1957(f)(2).

For the reasons explained above in conjunction with the mail fraud and wire fraud counts, the court does not believe that selling modified converter/descramblers as alleged in the superseding indictment constitutes "an activity that constitutes a felony under State, Federal, or foreign law," *see* § 1956(a)(1) & § 1956(c)(1), or a "criminal offense," *see* § 1957(a) & § 1957(f)(2). I shall, therefore, recommend that the motions to dismiss Count 36, Counts 37 through 46, and Counts 54 through 62 be granted as to defendants/Movants David Abboud, Joseph Abboud, and Baron Abboud.

## DECISION

**IT IS RECOMMENDED** that motions filed by defendants David Abboud, Baron Abboud, and Joseph Abboud to dismiss certain counts of the superseding indictment (filings # 141, # 145 and # 150) be granted.

Pursuant to NELR 72.4, any objection to this recommendation may be made by filing a "Statement of Objection to Magistrate Judge's Recommendation" within 10 days after being served with a copy of the recommendation. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis of the objection. The objecting party shall submit to the district judge at the time of filing the objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.